DAVID H. KRAMER, SBN 168452
Email: dkramer@wsgr.com
MAURA L. REES, SBN 191698
Email: mrees@wsgr.com
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone: (650) 493-9300

PAUL J. SAMPSON (admitted *pro hac vice*)
Email: psampson@wsgr.com
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
95 S. State Street, Suite 1000
Salt Lake City, Utah 84101-1560
Telephone: (801) 360-4314

ERIC P. TUTTLE, SBN 248440
Email: eric.tuttle@wsgr.com
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Telephone: (206) 883-2500

*Counsel for Defendant*
GOOGLE LLC

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| EVOX PRODUCTIONS, LLC,<br><br>Plaintiff,<br><br>v.<br><br>GOOGLE LLC,<br><br>Defendant. | Case No.: 5:26-cv-07013-EKL<br><br>**DEFENDANT GOOGLE LLC'S NOTICE OF MOTION AND MOTION TO DISMISS FIRST AMENDED COMPLAINT**<br><br>Date: March 17, 2027<br>Time: 10:00 a.m.<br>Courtroom: 7<br>Judge: Hon. Eumi K. Lee |

# TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION ........ 1
STATEMENT OF ISSUES TO BE DECIDED ........ 1
MEMORANDUM OF POINTS AND AUTHORITIES ........ 1
BACKGROUND ........ 4
I. EVOX's Photographs and Its License to Google. ........ 4
II. EVOX's Claims. ........ 5
III. The Nano Banana Pro Allegations. ........ 6
IV. The CMI Allegations. ........ 8
LEGAL STANDARD ........ 9
ARGUMENT ........ 9
I. Count Four Should Be Dismissed for Failure to Allege Infringement. ........ 9
A. EVOX Limits Itself to Three Photos and One Model. ........ 10
B. The Three Comparisons Do Not State a Claim for Infringement. ........ 10
II. Count Three Alleges No Post-License Copyright Infringement. ........ 12
A. EVOX's "Continuing Exploitation" Theories Do Not State an Infringement Claim. ........ 12
B. EVOX Fails to Show Infringement Through "Integration" of Nano Banana Pro with Google Ads. ........ 14
III. Count Five Based on CMI Removal Fails to State a Claim Because EVOX Pleads No Facts Showing That Google Intentionally Removed CMI from Any Unlicensed Image, or Knew That Removal Would Foster Infringement. ........ 15
A. EVOX Insufficiently Pleads Intentional Removal. ........ 15
B. EVOX Does Not Plausibly Allege § 1202(b)'s Second Scienter Element. ........ 21
CONCLUSION ........ 24

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Andersen v. Stability AI Ltd.*,
700 F. Supp. 3d 853 (N.D. Cal. 2023) .......... 13, 14

*Andersen v. Stability AI Ltd.*,
744 F. Supp. 3d 956 (N.D. Cal. 2024) .......... 13

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... 9

*Beaulier v. Meta Platforms, Inc.*,
2026 WL 2521848 (N.D. Cal. Aug. 26, 2026) .......... 15, 16, 17, 20

*Beaulier v. NVIDIA Corp.*,
No. 5:26-cv-02647-EKL, ECF No. 35 (N.D. Cal. Oct. 23, 2026) .......... 15

*Beaulier v. Roblox Corp.*,
2026 WL 2970550 (N.D. Cal. Oct. 2, 2026) .......... 15, 20

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .......... 9

*Concord Music Grp., Inc. v. Anthropic PBC*,
2025 WL 1487988 (N.D. Cal. Mar. 26, 2025) .......... 17, 18, 22

*Concord Music Grp., Inc. v. Anthropic PBC*,
2025 WL 4808984 (N.D. Cal. Oct. 6, 2025) .......... 16

*Cub Club Inv., LLC v. Apple Inc.*,
2022 WL 469378 (N.D. Cal. Feb. 16, 2022) .......... 11

*Doe 1 v. GitHub, Inc.*,
191 F.4th 1061 (9th Cir. 2026) .......... 4, 15, 16, 19

*Ets-Hokin v. Skyy Spirits, Inc.*,
323 F.3d 763 (9th Cir. 2003) .......... 3, 4, 11

*Fourth Est. Pub. Benefit Corp. v. Wall-Street.com, LLC*,
586 U.S. 296 (2019) .......... 10

*Harrington v. Pinterest, Inc.*,
2021 WL 4033031 (N.D. Cal. Sept. 3, 2021) .......... 21

*Harrington v. Pinterest, Inc.*,
2022 WL 4348460 (N.D. Cal. Sept. 19, 2022) .......... 20, 21, 23

*Hikma Pharms. USA Inc. v. Amarin Pharma, Inc.*,
608 U.S. 580 (2026) .......... 16, 20

*In re Century Aluminum Co. Sec. Litig.*,
729 F.3d 1104 (9th Cir. 2013) ........ 20

*In re Google Generative AI Copyright Litig.*,
809 F. Supp. 3d 903 (N.D. Cal. 2025) ........ 9, 10

*Kadrey v. Meta Platforms, Inc.*,
2023 WL 8039640 (N.D. Cal. Nov. 20, 2023) ........ 3, 10, 13

*Kadrey v. Meta Platforms, Inc.*,
2025 WL 744032 (N.D. Cal. Mar. 7, 2025) ........ 23

*Kitsch LLC v. Viori Beauty PBC*,
2026 WL 1356424 (C.D. Cal. May 8, 2026) ........ 11

*Litchfield v. Spielberg*,
736 F.2d 1352 (9th Cir. 1984) ........ 10, 12

*McGucken v. Shutterstock, Inc.*,
166 F.4th 361 (2d Cir. 2026) ........ 24

*MDY Indus., LLC v. Blizzard Ent., Inc.*,
629 F.3d 928 (9th Cir. 2010) ........ 12

*N.Y. Times Co. v. Microsoft Corp.*,
777 F. Supp. 3d 283 (S.D.N.Y. 2025) ........ 16, 18, 20

*Oracle Int'l Corp. v. Rimini St., Inc.*,
123 F.4th 986 (9th Cir. 2024) ........ 12

*Perfect 10, Inc. v. Amazon.com, Inc.*,
508 F.3d 1146 (9th Cir. 2007) ........ 14

*Soo Park v. Thompson*,
851 F.3d 910 (9th Cir. 2017) ........ 9

*Sprewell v. Golden State Warriors*,
266 F.3d 979 (9th Cir. 2001) ........ 9

*Stevens v. CoreLogic, Inc.*,
899 F.3d 666 (9th Cir. 2018) ........ 15, 21

*Tremblay v. OpenAI, Inc.*,
716 F. Supp. 3d 772 (N.D. Cal. 2024) ........ 10, 23

**STATUTES**

17 U.S.C. § 101 ........ 12, 14

17 U.S.C. § 106 ........ 13, 14

17 U.S.C. § 411 ........ 10

17 U.S.C. § 501 ........ 10

17 U.S.C. § 1202 .......... 1, 3, 6, 8, 15, 21
17 U.S.C. § 1203 .......... 3

**RULES**

Fed. R. Civ. P. 9 .......... 9

## NOTICE OF MOTION AND MOTION

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on March 17, 2027, at 10:00 a.m., or as soon thereafter as the matter may be heard, in Courtroom 7 of the United States District Court for the Northern District of California, San Jose Division, 280 South First Street, San Jose, California, before the Honorable Eumi K. Lee, Defendant Google LLC ("Google") will and hereby does move under Federal Rule of Civil Procedure 12(b)(6) to dismiss Counts Three, Four, and Five of the First Amended Complaint (ECF No. 29) ("FAC") of Plaintiff EVOX Productions, LLC ("EVOX").

This motion is based on this Notice of Motion and Motion, the following Memorandum of Points and Authorities, the pleadings and records on file in this action, and such other matters as the Court may consider.

Pursuant to Section VIII.A of the Court's Standing Order for Civil Cases, counsel for Google certifies that the parties met and conferred by videoconference on November 18, 2026, at least seven days before this motion was filed, and were unable to resolve the issues it presents.

## STATEMENT OF ISSUES TO BE DECIDED

1. Whether Count Four states a claim for infringement based on *any* model output, let alone outputs of models other than Nano Banana Pro, where the FAC describes output only for Nano Banana Pro and those outputs are not virtually identical to EVOX's product photos.
2. Whether Count Three states a claim for copyright infringement where the FAC alleges no facts plausibly showing any violation of EVOX's exclusive rights after the license term expired.
3. Whether Count Five states a claim under 17 U.S.C. § 1202(b)(1) where EVOX pleads no facts showing that Google intentionally removed copyright management information from any unlicensed image, or that Google knew or had reasonable grounds to know that any such removal would induce, enable, facilitate, or conceal infringement.

## MEMORANDUM OF POINTS AND AUTHORITIES

EVOX is one of millions of copyright holders that have licensed content to Google for widespread use throughout its operations. EVOX licensed Google part of its library of staged

automobile photographs, permitting Google to "reproduce, create derivative works based on, distribute, publicly display, publicly perform, and otherwise use the Licensed Content in connection with Google products or services." FAC Ex. A § 2.1. EVOX alleges that Google downloaded more than a million images under that license, FAC ¶¶ 57, 64, and used them to train Nano Banana Pro ("NBPro"), an image generation model Google offers through some of its products, *id.* ¶¶ 58-61, 140. Although EVOX's allegations would appear to make it a member of the putative class of image copyright holders seeking certification in *In re Google Generative AI Copyright Litig.*, No. 5:23-cv-03440-EKL (N.D. Cal. filed July 11, 2023), EVOX does not and cannot plausibly claim infringement based on Google's use of the licensed photos in training. By EVOX's own account, Google trained its model during the license term, FAC ¶ 138; and the expansive license authorized reproduction of the images for model training. Instead, EVOX nibbles at the edges of its license grant, claiming infringement based on alleged ancillary conduct. Those claims, resting on flawed legal theories, are meritless.

Two of EVOX's theories—that Google (i) downloaded from EVOX some images that were outside its license **(Count One)** and (ii) trained its unreleased Imagen 1 research model on unlicensed EVOX images listed in the public LAION-400M dataset and obtained from the open web **(Count Two)**—will be addressed after discovery. The remainder fail on the face of the FAC:

First, EVOX alleges that the output of Google's "image generation models" infringes EVOX's copyrighted images **(Count Four)**. EVOX does not even try to show such infringing output beyond comparisons of three purportedly exemplary EVOX images with quite obviously different outputs that EVOX itself generated using NBPro. As to any other models and images, for which EVOX identifies no infringing output, the claim necessarily fails. But the claim fails even for the three examples EVOX musters. For starters, EVOX does not identify the three images it claims were infringed, and so does not tie them to any registration in a copyright it owns. Even if a relevant registration exists, EVOX's copyright does not give it a monopoly on all photorealistic images of manufactured cars against plain backgrounds. EVOX fails to grapple with binding precedent holding that photographs of commercial products, like the unremarkable automobile make-and-model images EVOX asserts here, receive "thin" copyright protection "against only

virtually identical copying." *Ets-Hokin v. Skyy Spirits, Inc.*, 323 F.3d 763, 766 (9th Cir. 2003). EVOX concedes what the eye can easily see: that the generated outputs it proffers as alleged infringements are "variations" of the subject vehicle, FAC ¶ 85—not the "virtually identical copying" the law requires.

Next, EVOX alleges that Google infringed its copyrights by using EVOX's licensed images after the license expired **(Count Three)**. But EVOX fails to plead facts plausibly showing any infringement by Google after expiration of the license, on any of its three theories. First, it claims that NBPro continued to generate infringing output, but that theory fails with Count Four—for want of a showing of virtually identical outputs. Second, EVOX asserts that NBPro was itself a derivative work of EVOX images and Google continued to distribute the alleged derivative model. That fails because the argument that an AI model is a derivative work of all its training data is "nonsensical." *Kadrey v. Meta Platforms, Inc.*, 2023 WL 8039640, at *1 (N.D. Cal. Nov. 20, 2023). It also fails because EVOX does not allege facts showing that users' interactions with NBPro involve Google publicly distributing the supposed derivative model itself. Third, EVOX asserts that Google integrated NBPro with Google Ads, allowing advertisers to more easily use NBPro. But here again, the allegation of infringement is lacking—EVOX does not allege how this integration resulted in any new reproduction of EVOX's works or creation of any new derivative work.

Finally, EVOX hopes to backstop its infringement claims by adding its voice to a chorus of copyright holders seeking windfalls under inapposite provisions of the Digital Millennium Copyright Act ("DMCA") that regulate removal of "copyright management information" ("CMI") **(Count Five).** *See* 17 U.S.C. § 1202(b)(1). Seeking statutory damages of up to $25,000 "for each violation," *id.* § 1203(c)(3)(B); FAC, Prayer ¶ 2, EVOX claims that Google removed a "'©EVOX IMAGES' mark" and/or certain metadata from "unlicensed" EVOX images in training Google's "image generators." FAC ¶¶ 153-56. The plaintiffs in *In re Google* asserted a similar claim and abandoned it after Google moved to dismiss. *See In re Google Generative AI Copyright Litig.*, No. 5:23-cv-03440-EKL, ECF No. 1 ¶¶ 377-83; ECF Nos. 20, 25, 28. And the Ninth Circuit has since refused to let Section 1202(b) "supplant traditional copyright protections and subject defendants

to potentially ruinous liability" in the context of generative AI, "declin[ing] plaintiffs' invitation to transform run-of-the-mill copyright-infringement claims into DMCA claims." *Doe 1 v. GitHub, Inc.*, 191 F.4th 1061, 1071 (9th Cir. 2026).

The claim fails here too. EVOX has failed plausibly to allege that Google intentionally removed its CMI. EVOX points to the absence of CMI in several sample output images EVOX generated using NBPro, which EVOX claims are similar to some of its *licensed* images. From that, it seeks an inference that Google must have removed CMI from unspecified *unlicensed* images during the training process. But the outputs EVOX generated are new works whose lack of CMI shows nothing about what happened to CMI during training, assuming CMI was present in the first place. Further, EVOX pleads no facts showing that CMI was singled out for removal, as this Court and others have required to state a claim. Finally, EVOX has not pleaded facts plausibly showing that Google knew or had reasonable grounds to know that any alleged CMI removal would induce, enable, facilitate, or conceal infringement. Instead, it relies on the kind of generic assertions about increased infringement risk that have repeatedly been held insufficient. The requisite scienter is entirely absent.

The Court should dismiss Counts Three, Four, and Five.

## BACKGROUND

### I. EVOX's Photographs and Its License to Google.

EVOX maintains a "standardized library" of photographs of "every vehicle commercially available," which it licenses to companies in the automobile industry. FAC ¶¶ 8, 16. Its images follow product photography conventions: the vehicle is shot against white walls with no visible edges "to create the illusion of an endless background," and the images have a "'studio' effect" that avoids "unwanted reflections and lighting" and "color contamination" (including through use of "computer-assisted editing techniques"). *Id.* ¶¶ 27-29. Courts have recognized that "commercial product shot[s]" like these are entitled only to "a 'thin' copyright, which protects against only virtually identical copying." *Ets-Hokin*, 323 F.3d at 766.

In January 2020, EVOX and Google entered into a Content License Agreement. FAC ¶ 34 & Ex. A ("Agreement"). The Agreement grants Google a license to "reproduce, create derivative

works based on, distribute, publicly display, publicly perform, and otherwise use the Licensed Content in connection with Google products or services, subject to Section 2.2 (Restrictions)." Agreement § 2.1. "Licensed Content" is "all content made available by Licensor to Google under this Agreement using the delivery method in Attachment A," together with updates. *Id.* § 1.1(c). Section 2.2 lists restrictions, including one that "Google will not use Licensed Content in a [Business-to-Business] commercial offering that permits Users to repurpose Licensed Content for commercial purposes (for example, Licensed Content will not be offered to AdWords customers as a creative asset)." *Id.* § 2.2(e). In July 2020, the parties amended the license to cover EVOX's still and colorized images for "[a]ll Model Years available in the Licensor's library," while keeping its interactive exterior "Spins" and interior "Panoramas" limited to model years 2017 through 2021. FAC ¶¶ 35-36 & Ex. B ¶ 2.

The license runs for a defined "License Term." Agreement § 2.1; *see id.* Info. Table ¶ 7; *id.* Attach. A ¶ 4. The FAC does not say when the License Term ended, but it alleges that Google downloaded EVOX's images "[d]uring the term of the License Agreement," FAC ¶ 57, and that licensed images "were used to train [NBPro] during the license term," *id.* ¶ 138. EVOX then focuses on three actions it says took place "after the expiration of the License Term" (or "outside the license term"): (1) Google integrating its already-trained NBPro model with Google Ads (*id.* ¶ 75); and Google "continuing to exploit" the NBPro model post-license by (2) "distribut[ing] Nano Banana Pro itself" and (3) allowing NBPro to generate vehicle images that are "derivative of EVOX's copyright [sic] Images" (*id.* ¶¶ 137-39).

## II. EVOX's Claims.

The FAC asserts five counts. Counts One and Two allege that Google copied images it never licensed: Spins and Panoramas that Google allegedly downloaded from EVOX for model years outside the license, some of which Google then displayed on a "Knowledge Panel," FAC ¶¶ 33-46, 116-22; and 16,008 images associated with a public dataset, LAION-400M, that Google allegedly downloaded from the web and used to train an early, internal research model called "Imagen 1," *id.* ¶¶ 90-104, 123-30. Through discovery, Google will show that these two counts are meritless, but it does not move to dismiss them here. Count Three alleges that, after its license

with EVOX expired, Google continued to exploit NBPro—previously trained on licensed EVOX images—by continuing to allow users to use NBPro and by integrating that model with Google Ads. *Id.* ¶¶ 131-41. Count Four alleges that the outputs generated by Google image models, including NBPro and Imagen 1, infringe EVOX's copyrighted photos, *id.* ¶¶ 142-51. Count Five alleges intentional removal of CMI from unlicensed EVOX images in supposed violation of 17 U.S.C. § 1202(b)(1), *id.* ¶¶ 152-64.

## III. The Nano Banana Pro Allegations.

The claims in Counts Three and Four focus on NBPro, an image generation and editing tool. FAC ¶ 48. EVOX alleges that, "[d]uring the term of the License Agreement," Google downloaded 1,040,934 licensed EVOX images, *id.* ¶¶ 57, 64, that these licensed images were used to train NBPro "during the license term," *e.g.*, *id.* ¶¶ 58, 64, 138, and that Google also used unidentified "other[ images] that Google never licensed" to train NBPro, *id.* ¶ 140. And it alleges that "[i]n late 2025," "outside the license term," Google began integrating NBPro with Google Ads, its advertising service, facilitating advertisers' use of that model to generate new images for their ads. *Id.* ¶¶ 59-61, 75.

EVOX's theory is that, through training, "the content from the EVOX copyrighted Images became part of Nano Banana Pro." *Id.* ¶ 69. The alchemy EVOX imagines is vague and somewhat mystical: Google's training process allegedly "reduce[s an image] to a series of datapoints that the program uses to identify patterns and statistical relationships between elements of the sample image," "capture[s] content that is associated with the artistic expression … inherent to the image," "distill[s] the content from the sample images … into data that becomes part of the image generator itself," and "integrate[s]" content from the images into "weights and parameters that the image generator can later use to generate new images," "effectively mak[ing] the training images part of the image generator." *Id.* ¶¶ 50-56. On that basis, EVOX claims that NBPro is itself a "derivative" of all of its training images, and that the vehicle images NBPro may generate "are also derivative of EVOX's copyright[ed] Images." *Id.* ¶¶ 73-74, 138-39. From that, EVOX reasons that unidentified advertisers who might use NBPro to generate vehicle images would be "necessarily repurposing the content that EVOX had licensed to Google." *Id.* ¶ 69. EVOX identifies no

advertiser who did so, or basis for believing there is any; it alleges only that this "may have occurred thousands upon thousands of times." *Id.* ¶ 70.

The only NBPro outputs offered in the FAC are three sample sets. Each pairs an unspecified "EVOX reference" photograph with two images that EVOX allegedly generated "by inputting the vehicle model, color, and angle" into NBPro. *Id.* ¶¶ 82-83. The same prompt produced both generated images in each set, and EVOX does not say how many other, even more different outputs it generated but chose not to include. *Id.* ¶ 84. The first sample appears below:

**Sample 1: 2021 Sportback Premium Plus**




FAC ¶ 82. EVOX concedes that the generated images are "slightly different variations of the subject vehicle." *Id.* ¶ 85. It alleges that they nevertheless "contained artistic expression (e.g., shading, lighting quality, etc.) that copied EVOX's licensed content," while offering no explanation for the differences in shading, lighting, background, zoom, vehicle trim, and other aspects that are evident. *Id.*

Count Three is directed at Google's continuing exploitation of NBPro after the license expired, focusing on three activities: Google's "integrati[on]" of NBPro with Google Ads, which allegedly "permitt[ed] advertisers to repurpose EVOX's Licensed Content as a creative asset," *id.* ¶¶ 75, 136; Google's "continued distribution of Nano Banana Pro itself," *id.* ¶¶ 137-38; and NBPro's generation of "vehicle images," *id.* ¶ 139. Count Four separately claims that Google infringed EVOX's copyrighted images by "generating, displaying, and distributing images created by [Google's] image generation models," *id.* ¶ 145, because those images are "substantially similar to EVOX's copyrighted Images" and "imitate the distinctive creative techniques EVOX used to produce the copyrighted Images," *id.* ¶¶ 146, 148. The FAC contains no allegations as to any

models besides Imagen 1 and NBPro, and it offers no allegedly infringing output other than the three NBPro samples it generated.

**IV. The CMI Allegations.**

Count Five alleges that EVOX's images carried a visible "©EVOX IMAGES" mark "and/or" embedded metadata, and that Google intentionally removed this alleged CMI in violation of 17 U.S.C. § 1202(b)(1). FAC ¶¶ 152-64. The FAC limits the claim to images Google "had not licensed." *Id.* ¶¶ 154-55, 162. EVOX alleges, on information and belief, that to train its image-generating AI models, Google "first had to remove or alter the CMI so that the program did not confuse the CMI … as a component of the Image," *id.* ¶ 156. It alleges that this removal "is reflected by the outputs," because the three NBPro samples EVOX offers "do not contain any CMI from EVOX or any other copyright holder," *id.* ¶ 157. It alleges that removal was intentional supposedly because "Google representatives knew that it increased the value of EVOX's copyrighted Images during the training process." *Id.* ¶ 158.

EVOX further alleges that Google knew or had reason to know that this removal of CMI would induce, enable, facilitate, or conceal infringement, based on two theories. First, it claims that Google knew its models would generate "replicas, or near-replicas" of EVOX's images, that these replica outputs would "no longer contain EVOX's CMI," and that "customers would value" such outputs. *Id.* ¶¶ 160-61. "Accordingly," EVOX asserts, Google's supposed removal "induced, enabled, and facilitated the reproduction of EVOX Images, or derivatives of EVOX Images." *Id.* ¶ 162. Second, it claims that Google should have known that removal would conceal Google's infringement from others, because with no CMI in the output, users would have "no way to know that Google had infringed EVOX's copyrights." *Id.* ¶ 163. EVOX does not allege that Google knew EVOX or anyone else relies on CMI in model outputs to police its copyrights.

Although this claim is directed exclusively to *unlicensed* EVOX images, the only such images that the FAC specifically identifies as training data are the 16,008 LAION-400M images allegedly used to train Imagen 1. *Id.* ¶¶ 99-102, 126. EVOX learned of that use from Google's own 2022 research paper, in which Google's researchers "acknowledged" training Imagen 1 on "the publicly available LAION-400M dataset." *Id.* ¶¶ 90-91, 100. The FAC does not allege that Imagen

1 was ever made available to users, and it identifies no Imagen output, much less Imagen output lacking CMI or infringing EVOX images of which Google was supposedly aware.

## LEGAL STANDARD

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," *id.*, and the Court need not accept "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences," *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001). A complaint that pleads facts "merely consistent with" liability "stops short of the line between possibility and plausibility," *Iqbal*, 556 U.S. at 678, particularly where the conduct alleged has an "obvious alternative explanation," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 567 (2007). Intent and knowledge may be "alleged generally," Fed. R. Civ. P. 9(b), but that rule does not give a plaintiff "license to evade the less rigid—though still operative—strictures of Rule 8." *Iqbal*, 556 U.S. at 686-87. Allegations on information and belief are permitted "where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible." *Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017) (cleaned up). But *Soo Park* "did not hold that a claim may be sustained absent any supporting factual allegations." *In re Google Generative AI Copyright Litig.*, 809 F. Supp. 3d 903, 921 n.10 (N.D. Cal. 2025).

## ARGUMENT

### I. Count Four Should Be Dismissed for Failure to Allege Infringement.

Count Four alleges that Google "has infringed EVOX's exclusive rights under the Copyright Act by generating, displaying, and distributing images created by its image generation models that reproduce, or are unauthorized derivative works of, EVOX's copyrighted Images." FAC ¶ 145. The only images the FAC even purports to identify as alleged infringements are six NBPro outputs, which EVOX puts side-by-side with three of its photographs. *Id.* ¶¶ 82-85. Count Four fails as to every other model and image, for which EVOX alleges no output at all. It also fails

even for the three comparisons it proffers.

**A. EVOX Limits Itself to Three Photos and One Model.**

An output infringes only if it copies protected expression from a specific work. *Litchfield v. Spielberg*, 736 F.2d 1352, 1357 (9th Cir. 1984); *see also Kadrey*, 2023 WL 8039640, at *1; *Tremblay v. OpenAI, Inc.*, 716 F. Supp. 3d 772, 778 (N.D. Cal. 2024) (plaintiff must allege that "particular output is substantially similar"). Count Four accuses the outputs of Google's "image generators," FAC ¶ 146—"including the Imagen and Nano Banana series of image generation models," *id.* ¶ 143—and asserts that they copy EVOX's images across "sedans, SUVs, trucks, coupes, and minivans across a range of manufacturers," *id.* ¶ 147. But EVOX identifies outputs of only one AI model, NBPro, and compares them with only three of its photographs. *Id.* ¶¶ 82-85. It identifies no output of any Imagen model or other AI model, and no output resembling any other EVOX photograph. As this Court held in *In re Google*, a plaintiff who alleges no facts about a model does not plausibly allege infringement by it. 809 F. Supp. 3d at 914. At most, Count Four can reach the alleged infringement of the three EVOX photographs included in the FAC through the NBPro outputs that EVOX holds up for scrutiny.

EVOX seems to believe it can overcome this problem with a sweeping theory that every image a model generates is derivative of all the model's training data. FAC ¶ 139. That is not the law, and courts in this District have already rejected the theory out of hand. *See Tremblay*, 716 F. Supp. 3d at 778 (allegation that "every output … is an infringing derivative work" insufficient where plaintiffs did not "allege that any particular output is substantially similar—or similar at all"); *Kadrey*, 2023 WL 8039640, at *1. To even begin a claim, similarity between specific outputs and specific copyrighted images must be shown. EVOX does not even try, save for three sets of sample images, and thus fails out of the gate with respect to anything else.

**B. The Three Comparisons Do Not State a Claim for Infringement.**

Even as to the three sets of sample images it includes in the FAC, however, EVOX's claim goes nowhere. To begin, EVOX does not identify the three photographs it offers up as references, or registrations it supposedly holds for them. A plaintiff must own the work and may not sue on it until the Copyright Office has registered it. 17 U.S.C. §§ 411(a), 501(b); *Fourth Est. Pub. Benefit*

*Corp. v. Wall-Street.com, LLC*, 586 U.S. 296, 299 (2019). This is no technicality; by its own count, EVOX holds registrations for only half of its photographs. *See* FAC ¶ 22 (alleging that "EVOX owns and controls the copyrights in over two million digital photographs … and has [registered] over one million of these works"). If EVOX claims to own registered copyrights for works it claims to be infringed by NBPro output, it must provide those details with specific factual allegations. It has not.

In any event, EVOX's comparisons do not plausibly demonstrate infringement. Under the related copyright doctrines of merger and scènes à faire, protection for works is narrow when there are limited ways to express the same idea. *Ets-Hokin*, 323 F.3d at 765-66. In *Ets-Hokin*, the Ninth Circuit applied those principles to a photo of a vodka bottle, where "similarity is inevitable" and driven by "conventions of the commercial product shot," holding that such photos receive "only a 'thin' copyright, which protects against only virtually identical copying." *Id.* at 766. Simply by looking at the photos, the Ninth Circuit had no trouble holding that they were not "virtually identical," but instead differed in various respects, and thus were "not infringing." *Id.*

So too here. A visual comparison of the EVOX "reference" images and model outputs depicted in the FAC shows that they are not virtually identical but contain numerous differences. They both appear to depict the same make and model of car on a light background, but those are "standard features commonly associated with" product images. *Kitsch LLC v. Viori Beauty PBC*, 2026 WL 1356424, at *5 (C.D. Cal. May 8, 2026). The similarity ends there. EVOX's vehicles sit on a white field with "no visible edges," FAC ¶ 28. The generated vehicles sit before gray backdrops or in rooms with visible floor and wall lines, with different lighting, shadows, colored backgrounds, zoom levels, and reflections, and the cars themselves carry different wheels, grilles, and trim. *Id.* ¶ 82. Within the constraints EVOX imposed through its prompts specifying model, color, and angle (*id.* ¶ 83), "they differ in as many ways as possible"; the only constant is the product itself. *Ets-Hokin*, 323 F.3d at 766. The FAC even concedes that the outputs are "slightly different variations of the subject vehicle." FAC ¶ 85. Variations are not virtually identical copies, and Count Four should be dismissed. *See Cub Club Inv., LLC v. Apple Inc.*, 2022 WL 469378, at *1 (N.D. Cal. Feb. 16, 2022) (dismissing copyright infringement claim where accused work was

not "virtually identical" to plaintiff's work).

## II. Count Three Alleges No Post-License Copyright Infringement.

Count Three offers up three ill-conceived theories by which Google supposedly infringed EVOX's copyrights by continuing to use EVOX's licensed images *after* the License Term expired. FAC ¶¶ 75, 136-39. While the FAC labels Count Three as "use exceeding the scope of the license," and even points to license restrictions (*id.* ¶¶ 133-36), that framing is a distraction. Irrespective of any prior license, the claim fails because the FAC alleges no facts plausibly showing violation of one of EVOX's exclusive rights under Section 106 of the Copyright Act after the License Term expired.[1]

### A. EVOX's "Continuing Exploitation" Theories Do Not State an Infringement Claim.

EVOX asserts that Google "continu[ed] to exploit Licensed Content after the expiration of the License Term," FAC ¶ 137, by "distribution of Nano Banana Pro," which EVOX calls a derivative work, *id.* ¶ 138, and through vehicle images that the model can generate, *id.* ¶ 139. The first theory, based on the NBPro model itself, fails because a trained model is not an infringing derivative of the materials used to train it, and EVOX pleads no facts showing that Google publicly distributed the model itself. The second, output-based theory fails for the same reason Count Four fails: EVOX identifies no output that infringes. *See supra* at 9-12.

***Nano Banana Pro Is Not an Infringing Derivative Work.*** EVOX theorizes that Google's image generators are themselves derivative works on the premise that the models contain "weights and parameters derived from" EVOX's content. FAC ¶¶ 15, 54-55, 73-74, 138. A derivative work is one in which a preexisting work is "recast, transformed, or adapted." 17 U.S.C. § 101. It must be "substantially copied from the prior work," *Litchfield*, 736 F.2d at 1357, and must incorporate the preexisting work, either "literally" or "nonliterally," such as "copying the 'total concept and feel' of a preexisting work," *Oracle Int'l Corp. v. Rimini St., Inc.*, 123 F.4th 986, 995 (9th Cir.

---

[1] To make out a claim for copyright infringement (as opposed to breach of contract), EVOX would have to show not only that Google's conduct exceeded the scope of the license, but also that it did so "in a manner that implicates one of the licensor's exclusive statutory rights [under Section 106]." *MDY Indus., LLC v. Blizzard Ent., Inc.*, 629 F.3d 928, 940 (9th Cir. 2010).

2024). As other judges in this District have recognized, the theory that a generative model is itself an infringing derivative of its training data is "nonsensical": "There is no way to understand [AI] models themselves as a recasting or adaptation of any of the plaintiffs' books." *Kadrey*, 2023 WL 8039640, at *1; *see also Andersen v. Stability AI Ltd.*, 700 F. Supp. 3d 853, 866-67 n.7 (N.D. Cal. 2023) (dismissing, as inadequately pleaded, theory that an image generation model is a "derivative work" because it "contains compressed copies of billions of copyrighted images"). EVOX's allegations that training images are "transformed into numerical or other machine-readable representations" and become "weights and parameters," FAC ¶¶ 54-55, rest on the same generic theory that these courts have rejected. And given EVOX's failure to allege virtual identity between NBPro output and EVOX's protected expression, *see supra* at 10-12, there are no plausible allegations that the model in any sense contains or embodies EVOX's protected works.[2]

***EVOX Fails to Allege Distribution of Nano Banana Pro.*** Even if NBPro were itself somehow derivative of all training data, including EVOX's images, the FAC's conclusory allegations do not contain facts plausibly showing a violation of any exclusive rights under the Copyright Act with respect to the model. EVOX asserts in conclusory fashion that Google "continued distribution of Nano Banana Pro itself" after the license expired. FAC ¶ 138. But the FAC is devoid of factual allegations showing how Google supposedly engaged in *public distribution of the model itself* in violation of EVOX's statutory rights. Section 106 gives EVOX the exclusive right to "prepare derivative works based upon" its copyrighted images, 17 U.S.C. § 106(2), but EVOX is not accusing Google of creating NBPro outside the license. Section 106 also gives EVOX the right "to distribute copies … of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending." *Id.* § 106(3). "Copies" are "material

---

[2] Judge Orrick's later decision in *Andersen v. Stability AI Ltd.*, 744 F. Supp. 3d 956 (N.D. Cal. 2024), is not to the contrary. It allowed a model-as-derivative-work theory to proceed past the pleadings not based on general allegations that the model was trained using the plaintiffs' works, but because, after the claim was dismissed for "lack of plausible facts," *id.* at 968 n.8, the plaintiffs amended to add detailed factual allegations plausibly showing that the model "contained, in some manner," the plaintiffs' protected works—including the defendant's CEO's statement that the model compressed 100,000 gigabytes of images into a file that could "recreate" them, *id.* at 968 & n.9, 974, published research showing the model could reproduce training images, *id.* at 974, 982-83, and outputs mimicking plaintiffs' works when the model was prompted with their names, *id.* at 974, 976-77. EVOX pleads none of this.

objects … in which a work is fixed." 17 U.S.C. § 101. Infringing the distribution right therefore requires an "actual dissemination" of a copy of the work. *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1162 (9th Cir. 2007). The FAC contains no allegations showing public distribution of copies of EVOX's images or whole copies of the allegedly infringing NBPro model.

To be sure, the FAC alleges that Google continued to allow users to *interact* with NBPro after EVOX's license expired, *e.g.*, FAC ¶¶ 59-61, 75, 137-39, but that is not the same as distributing the model itself. Google is not alleged to have handed out copies of NBPro, or to have disseminated copies of EVOX's images whenever users interacted with NBPro. *See Andersen*, 700 F. Supp. 3d at 866 (dismissing claim for lack of "plausible facts" that defendant distributed the model to users who accessed it through defendant's app or website). EVOX's theory thus fails to show infringement by distribution of NBPro.

**B. EVOX Fails to Show Infringement Through "Integration" of Nano Banana Pro with Google Ads.**

EVOX's third theory in Count Three is that Google engaged in infringement when, "outside the license term" in "late 2025," Google "began integrating Nano Banana Pro with a product called 'Google Ads.'" FAC ¶¶ 59, 75. This allowed Google Ads users to "use Nano Banana Pro to generate images and other visual content that would be displayed with their advertisements." *Id.* ¶ 61. This alleged "integration," i.e., making NBPro easily available to users of another service, describes no act of copyright infringement.

EVOX does not allege facts showing that the integration of a preexisting model with another service involved reproducing EVOX's images, or implicated any other exclusive right under Section 106. EVOX fuzzily alleges that because content "from the EVOX copyrighted Images became part of Nano Banana Pro," advertisers who use the model to generate vehicle images "were necessarily repurposing the content that EVOX had licensed to Google." *Id.* ¶ 69. But the Copyright Act grants no exclusive right against "repurposing" a work's content; it reaches reproduction, creation of derivative works, public distribution, and public display of protected expression. *See* 17 U.S.C. § 106. To the extent EVOX's allegation is comprehensible, it appears to be a retread of EVOX's failed theories discussed above that Google distributed a derivative

work in the form of NBPro and/or that advertisers could theoretically use NBPro to generate infringing images. It fails for the same reasons.

**III. Count Five Based on CMI Removal Fails to State a Claim Because EVOX Pleads No Facts Showing That Google Intentionally Removed CMI from Any Unlicensed Image, or Knew That Removal Would Foster Infringement.**

Section 1202(b)(1) prohibits intentionally removing or altering CMI, without authority, while "knowing, or … having reasonable grounds to know, that it will induce, enable, facilitate, or conceal an infringement." 17 U.S.C. § 1202(b). A plaintiff must plausibly allege "(1) the existence of CMI associated with the work; (2) the removal or alteration of that CMI; (3) that the removal or alteration … was intentional; and (4) that the defendant knew, or had reasonable grounds to know, that the removal [or alteration] would induce, enable, facilitate, or conceal infringement." *Beaulier v. Meta Platforms, Inc.*, 2026 WL 2521848, at *2 (N.D. Cal. Aug. 26, 2026) (citing *Stevens v. CoreLogic, Inc.*, 899 F.3d 666, 673 (9th Cir. 2018)). EVOX asserts that Google removed CMI from "unlicensed" EVOX images during training of Google's "image generators" (FAC ¶¶ 154-56), but does not allege facts plausibly showing such intentional removal or showing that Google knew it would induce, enable, facilitate, or conceal infringement.

**A. EVOX Insufficiently Pleads Intentional Removal.**

Intentional removal is the "gatekeeper" element to EVOX's § 1202(b) claim. *Beaulier v. Roblox Corp.*, 2026 WL 2970550, at *4 n.3 (N.D. Cal. Oct. 2, 2026). The statutory verbs "remove" and "alter" "imply taking an affirmative act with respect to CMI connected to a work that already exists." *GitHub*, 191 F.4th at 1069. A plaintiff therefore "must … allege that defendants removed or altered CMI from copies of existing protected works; merely alleging that a similar or derivative work does not include the CMI, without facts showing its removal or alteration, is insufficient." *Id.* Further, to allege that removal was "intentional," rather than "an incidental byproduct of a process undertaken for a different purpose," the complaint must plausibly allege "a deliberate, CMI-centered choice," i.e., "that CMI was singled out for removal." *Beaulier v. Meta*, 2026 WL 2521848, at *3-4; *see Beaulier v. NVIDIA Corp.*, No. 5:26-cv-02647-EKL, ECF No. 35 (N.D. Cal. Oct. 23, 2026) (finding *Beaulier v. Meta* "persuasive" and "adopt[ing] the reasoning set forth therein"). And because removal is an inference EVOX asks the Court to draw, the facts alleged

must make it plausible, which requires facts that "rule out 'obvious alternative explanation[s]' for the defendant's conduct." *Hikma Pharms. USA Inc. v. Amarin Pharma, Inc.*, 608 U.S. 580, 590 (2026). EVOX's allegations fail at every level: EVOX pleads no details about the training process that would show CMI being targeted for removal; its only allegation of removal concerns licensed images, not the unlicensed images that Count Five accuses; that evidence consists of no more than what the Ninth Circuit held in *GitHub* to be "insufficient": model outputs that are allegedly "similar or derivative work[s]" lacking CMI (191 F.4th at 1069); and EVOX fails to rule out other obvious explanations for why its generated output would lack CMI.

**1. EVOX Pleads No Facts Showing Targeted CMI Removal.**

Because the FAC alleges no details about how CMI was supposedly removed during training, it does not plead facts supporting the reasonable inference that removal, if it occurred at all, was directed to CMI and thus intentional, rather than an incidental byproduct of some more general process. *Beaulier v. Meta*, 2026 WL 2521848, at *3-4. Where courts have allowed § 1202(b) removal claims against AI developers to proceed past the pleadings, the complaints alleged specific facts about how CMI was targeted to be stripped from training data. In *New York Times*, the court dismissed a § 1202(b)(1) claim because the complaint did "not include any specific detail on how CMI was allegedly removed during the training process," while other claims survived because they identified the "Dragnet and Newspaper" extractors and described how they separated article text from "footers" and "copyright notices." *N.Y. Times Co. v. Microsoft Corp.*, 777 F. Supp. 3d 283, 314-15 (S.D.N.Y. 2025). In another case before this Court, the claim survived where publishers identified a specific text-extraction tool and alleged that Anthropic chose it "specifically because it was more effective at removing CMI," with details to back that up. *Concord Music Grp., Inc. v. Anthropic PBC*, 2025 WL 4808984, at *4 (N.D. Cal. Oct. 6, 2025) ("*Concord II*").

EVOX alleges nothing comparable. It identifies no particular tool, filter, or processing step that Google applied; says nothing about how the CMI supposedly gets removed or whether the process targets CMI specifically; and describes no decision by anyone at Google to select or design a process directed at stripping CMI. Its speculation that Google "had to remove or alter the CMI

so that the program did not confuse" it with the image, FAC ¶ 156, and thus that removal "was intentional because Google representatives knew that it increased the value of EVOX's copyrighted Images during the training process," *id.* ¶ 158, does not plausibly allege the singling out of CMI; the same rationale would apply to *any* information unhelpful to training. "[R]etaining useful portions of information and discarding the rest is not sufficient to demonstrate intent," nor is alleging that separation of CMI is "inherent" in the process. *Beaulier v. Meta*, 2026 WL 2521848, at *4. EVOX simply alleges no facts plausibly establishing that Google targeted CMI in particular for removal. *Id.*; *see also Concord Music Grp., Inc. v. Anthropic PBC*, 2025 WL 1487988, at *6-7 (N.D. Cal. Mar. 26, 2025) ("*Concord I*") (dismissing conclusory allegations of intentional CMI removal without sufficient supporting facts).

**2. EVOX's Only Support for Supposed Removal Concerns Images Not at Issue in Count Five.**

EVOX's allegations depend on inferences drawn from images that Count Five does not even purport to cover. The FAC asserts that "Google's unauthorized removal of CMI from EVOX's copyrighted Images during the training phase is reflected by the outputs," pointing to "the sample images generated by Nano Banana Pro documented herein." FAC ¶ 157. The absence of CMI in those generated images, EVOX argues, means that EVOX's CMI must have been removed from its images at the training stage. *Id.* The many problems with that logical leap are addressed below, but first a more basic problem: The three sample sets of NBPro outputs have nothing to do with Count Five.

The FAC limits Count Five to "unlicensed" images. *Id.* ¶¶ 154-55, 162. The only *unlicensed* images the FAC identifies as AI model training data are the 16,008 LAION-400M images allegedly used to train a *different* model, Imagen 1. *Id.* ¶¶ 99-102, 126.[3] The FAC contains

---

[3] EVOX alleges, on information and belief, that Google trained NBPro on licensed images "along with others that Google never licensed." FAC ¶ 140. But it never identifies those "others." The FAC does allege that Google downloaded from EVOX, and in some cases displayed on Google's "Knowledge Panel," over 200,000 specific images that were outside the parties' Agreement. *Id.* ¶¶ 12, 34-46. It pleads a whole separate count (Count One) based on that conduct. *Id.* ¶¶ 119-20. But EVOX never squarely alleges that any of these unlicensed images was used to train NBPro or any other model, let alone any facts that would render such an allegation plausible.

(continued...)

no allegations about Imagen 1 outputs, or that Imagen 1 (an early research model) was ever made available to the public. The FAC says nothing about the training process for Imagen 1 specifically, other than alleging that it involved reproduction of EVOX's images. *Id.* ¶¶ 101-02.

Meanwhile, the FAC specifically alleges that the three sets of sample images EVOX generated *using NBPro* "copied EVOX's ***licensed*** content." *Id.* ¶ 85 (emphasis added). Such licensed images are excluded from Count Five. *Id.* ¶ 162. The FAC admits that Google's alleged use of unlicensed EVOX images "to develop Imagen 1 … is factually and legally distinct from Google's … use of licensed EVOX content in connection with Nano Banana Pro." *Id.* ¶ 129. The sample NBPro outputs and their alleged similarity to *licensed* EVOX images provide no support for a claim of CMI removal from *unlicensed* images in connection with training Imagen 1 (or any other AI model).

**3. Outputs That Lack CMI Do Not Show Removal from Training Copies.**

By themselves, examples of model outputs that lack CMI show nothing about the presence, absence, or removal of CMI from training images. EVOX would have the Court infer that because the NBPro samples "do not contain any CMI," Google must have stripped CMI from its training copies. FAC ¶ 157; *see id.* ¶ 156. This Court has seen that theory before. In *Concord I*, music publishers alleged that Anthropic's models produced "nearly word-for-word" copies of their lyrics without the accompanying CMI, and asked the Court to infer that Anthropic had designed its training process to remove CMI. 2025 WL 1487988, at *2, *6-7. The Court declined: allegations that "simply repeat the statutory language" are conclusory, and the publishers pleaded "no specific facts that reflect Anthropic's intentional removal of CMI." *Id.* at *6-7. The inference EVOX asks the Court to draw here is even less defensible. EVOX concedes that NBPro's outputs are "different variations of the subject vehicle." FAC ¶ 85. Given that, there is no reason to believe they are the product of CMI removal from training images. *See N.Y. Times*, 777 F. Supp. 3d at 314 (where outputs were not "complete or substantially complete copies," "it is entirely plausible that CMI remained on the articles included in the training datasets but simply did not appear in the outputs").

---

For example, the FAC includes no comparison of an AI model output to any of these (or any other) unlicensed images.

The Ninth Circuit's recent decision in *GitHub* is instructive here. Based on allegations of how generative AI models work that are similar to the allegations here, *compare* 191 F.4th at 1065, *with* FAC ¶¶ 50-51, 54, the appellate panel observed that a generative model "does not look up and reproduce stored work but rather creates new work," 191 F.4th at 1068. The AI output "may … infringe plaintiffs' copyrights"—e.g., by producing a "substantially similar" work or a "derivative work"—but "it cannot reasonably be described as a copy of [plaintiffs' works] from which CMI has been 'removed' or 'altered.'" *Id.* at 1068, 1070. "[P]laintiffs must therefore allege that defendants removed or altered CMI from copies of existing protected works; merely alleging that a similar or derivative work does not include the CMI, without facts showing its removal or alteration, is insufficient." *Id.* at 1069.

*GitHub* addressed CMI omitted from outputs; it did not decide whether CMI was removed from training copies. But its reasoning shows why outputs lacking CMI say nothing about training copies. If generated images are new works that never carried (and were never required to carry) EVOX's CMI, the absence of CMI in outputs is exactly what one would expect whether or not anyone removed CMI from any training image. EVOX's own allegations describe how AI models "generate new images" from the "patterns and statistical relationships" they learn. FAC ¶¶ 50, 54. That dooms EVOX's attempt to use those "new images" to try to say anything about CMI in the training images.

**4. EVOX Does Not Rule Out Obvious Alternative Explanations.**

At bottom, EVOX's proposed inference that Google intentionally removed CMI from training images rests on an unstated assumption that, but for such hypothetical removal, EVOX's CMI would have appeared in the handful of model outputs EVOX generated. That assumption rests on other, unsupported assumptions, including that: (1) EVOX's images (rather than other images depicting the same vehicles) were used to train NBPro; (2) those EVOX images contained CMI that was targeted for removal; (3) the sample images EVOX generated are closely influenced in some way by EVOX's images rather than other images the model saw in training; and (4) because of that, EVOX's CMI would have been reproduced in the output had it not been removed at training. EVOX's allegations are at most "merely consistent with" its desired inference of

removal. *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1108 (9th Cir. 2013). EVOX does not allege facts tending to "exclude" or "rule out" the opposite assumptions and the obvious alternative explanations for the absence of CMI in the outputs. *Id.*; *Hikma*, 608 U.S. at 590.

- ***No CMI Present on Source Copies.*** The "unlicensed" copies Google allegedly obtained from third-party websites may never have borne EVOX's CMI. EVOX alleges on information and belief that "each of the unlicensed Images that was improperly downloaded contained the CMI," FAC ¶ 155. But the LAION-400M images were copies posted at third-party internet locations, which EVOX can and did investigate. *Id.* ¶¶ 97-99, 125 & Ex. E. It should know whether they had CMI to begin with. Even if some did, Google may have entirely excluded images with visible marks from training, rather than altering them.

- ***CMI Innocently Not Preserved.*** CMI may have been lost through generalized processing not intentionally directed to CMI removal. EVOX alleges that training images are "ingested, preprocessed, encoded, transformed into numerical or other machine-readable representations." *Id.* ¶ 55; *see id.* ¶ 50 (images "reduced to a series of datapoints"). Judge Freeman recently held that materially identical allegations—that training "involves transforming raw … files into numerical or visual representations that can be used as training inputs"—"undermine the plausibility" of a removal claim and "buttress an alternative, innocent account": that the defendant "passively failed to preserve CMI." *Roblox*, 2026 WL 2970550, at *5. Such a "uniform process" in which "removal is a side effect" does not plead intentional removal. *Id.* at *7; *see also Beaulier v. Meta*, 2026 WL 2521848, at *3-4 ("uniform transformation that incidentally sheds CMI" is not intentional removal); *Harrington v. Pinterest, Inc.*, 2022 WL 4348460, at *4 (N.D. Cal. Sept. 19, 2022) ("wholesale metadata removal, without more," is not intentional removal).

- ***No CMI in Outputs.*** CMI on EVOX's images may not have appeared in generated outputs even if those images were used for training with their CMI intact. A model, for example, can learn that an artifact like a copyright notice is not part of the subject it is asked to depict, including by seeing many different images of the same subject (with varying CMI). *See N.Y. Times*, 777 F. Supp. 3d at 314. In generating a new image, models draw on statistical relationships derived from many different images of a subject. FAC ¶¶ 50-51. Other images of the same widely-photographed vehicles, in the same color, from the same angle, are everywhere. *Compare id.* ¶ 82, *with, e.g.*, this Google Images search: https://www.google.com/search?udm=2&q=2021+Sportback+Premium+Plus+white+background. Output filters may also create new, generic metadata for generated images or decline to present output containing stray marks.

EVOX pleads no facts excluding any, let alone all, of these obvious alternative explanations for the absence of CMI in NBPro output, so the inference of intentional removal that it asks this Court to draw fails the plausibility standard. *See Hikma*, 608 U.S. at 590; *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d at 1108.

**B. EVOX Does Not Plausibly Allege § 1202(b)'s Second Scienter Element.**

Section 1202(b) separately requires that a defendant know or have reasonable grounds to know that any supposed CMI removal "will induce, enable, facilitate, or conceal an infringement." 17 U.S.C. § 1202(b). The element demands "a more specific application than the universal possibility of encouraging infringement; specific allegations as to how identifiable infringements 'will' be affected are necessary." *Stevens*, 899 F.3d at 674. The "general possibility that exists whenever CMI is removed" is not enough; a plaintiff must plead facts, such as a "pattern of conduct" or "modus operandi," showing that the defendant knew "future infringement is likely, albeit not certain, to occur as a result of the removal or alteration of CMI." *Id.* at 673-75.

*Harrington v. Pinterest, Inc.* demonstrates what a plaintiff must plead to satisfy this second scienter requirement at the pleading stage. The amended complaint there alleged that Pinterest's removal of metadata made copyrighted photographs more difficult to locate, impaired takedown efforts, and forced copyright owners to use more expensive methods to detect infringement. 2021 WL 4033031, at *6 (N.D. Cal. Sept. 3, 2021) ("*Harrington I*"). The court dismissed the complaint because those allegations established only the generalized "possibility of encouraging infringement," not the specific knowledge *Stevens* requires. *Id.* The plaintiff then amended further to allege that he personally used the metadata to identify his works, establish ownership, and enforce his copyrights. The court dismissed again because the complaint still alleged no facts showing Pinterest *knew* of those practices—for example, that the plaintiff had informed Pinterest about them. 2022 WL 4348460, at *5-7 ("*Harrington II*"). A generalized assertion that removing metadata hinders copyright enforcement, even enforcement efforts by the plaintiff himself, remained the sort of "'generic approach'" that *Stevens* held "'won't wash.'" *Id.* at *5-6.

The two scienter theories that EVOX advances fail under this and related precedent.

***Concealment.*** EVOX alleges that Google "should have known that its removal of CMI from EVOX's copyrighted images would conceal its infringement from others," because "users of the image generators would have no way to know that Google had infringed EVOX's copyrights." FAC ¶ 163. This conclusory allegation falls short for two reasons.

First, EVOX does not attempt to square its conclusory concealment allegations with its

express *admissions* that Google publicly disclosed the only unlicensed training use the FAC identifies. Count Five concerns only "unlicensed" works (FAC ¶ 162), and the only specific unlicensed works alleged to have been trained on are the ones in the LAION-400M dataset used for Imagen 1. *Id.* ¶¶ 99-102, 126. EVOX pleads that in 2022 Google published a paper disclosing its use of "the publicly available LAION-400M dataset" to train Imagen 1, and that EVOX was able to identify its images in that public dataset. *Id.* ¶¶ 90-91, 99. EVOX's own complaint refutes the charge of concealment.

Second, EVOX does not plead specific facts showing how Google knew that the supposed removal of CMI from EVOX images would conceal or make it more difficult for EVOX to detect supposed infringements. As in *Harrington I* and *II*, EVOX does not allege that it relies on CMI appearing in generated outputs to detect and police whether Google is using its images, that it ever informed Google of any such practice, or that Google otherwise knew about one.[4] Without facts showing that (1) removal would probably interfere with detection of identifiable infringement, *and* (2) Google knew or had reasonable grounds to know of that consequence, EVOX alleges only the generalized traceability concern that *Stevens* and *Harrington* found insufficient.

***Customer Preference.*** EVOX also contends that Google knew its models would generate "replicas, or near-replicas" of EVOX's images that "would no longer contain EVOX's CMI," and knew that "customers would value" images without CMI. FAC ¶¶ 160-61. "Accordingly," EVOX asserts, "Google induced, enabled, and facilitated the reproduction of EVOX Images, or derivatives of EVOX Images." *Id.* ¶ 162. EVOX's only allegation that Google *knew or should have known* that removal would induce such infringement simply recites the statute. *Id.* ¶ 159. EVOX pleads no facts to support this conclusory theory, and so fails to state a plausible claim. *See Concord I*, 2025 WL 1487988, at *7 (rejecting as "too conclusory" allegations that an AI model's training process imbued the defendant with knowledge that removal of CMI would induce third-

[4] In addition, as discussed below, while EVOX alleges in conclusory fashion that Google knew its AI models would generate replicas of EVOX's images and that they would "no longer contain EVOX's CMI," FAC ¶¶ 160-61, it alleges no facts rendering those statements plausible. Nor does EVOX squarely allege that Google knew the output would have included EVOX's CMI but for its removal from the training data.

party infringement); *Tremblay*, 716 F. Supp. 3d at 779 (dismissing where plaintiffs did not show "how omitting CMI in the copies used in the training set gave Defendants reasonable grounds to know that ChatGPT's output would induce, enable, facilitate, or conceal infringement").

For example, the FAC alleges no facts plausibly showing that Google would have known its models would output images infringing EVOX's "thin" copyright, or that people would try to do that. As explained, *supra* at 9-12, EVOX itself has not managed to generate such outputs or at least has not shared any. Nor are facts alleged to show Google would have known that such outputs would have contained EVOX's CMI but for its removal during training. As explained, *supra* at 19-20, there are many alternative reasons CMI would not appear in output. And while EVOX alleges Google knew its users would "value" outputs lacking CMI, FAC ¶ 161, it does not plead facts showing how Google knew that, let alone connect the dots to plausibly show how Google knew this would induce or facilitate any infringement. It makes no sense to argue that seeing CMI in output would prevent users from having generated the output in the first place. Nor does EVOX allege that any user has ever engaged in further downstream infringements of EVOX's copyrights after generating a hypothetical infringing image, let alone that they would not have done so if the generated image contained CMI,[5] let alone that Google knew any of this. *See Harrington II*, 2022 WL 4348460, at *6 (allegations that Pinterest removed CMI to make paid advertisements more effective insufficient to establish second scienter requirement because they were "not self-evident" and lacked factual support).

The Court can stop at the absence of factual allegations showing that Google knowingly fomented infringement. But EVOX affirmatively pleads that the reason Google allegedly removed CMI from EVOX's images during training was "so that the program did not confuse the CMI … as a component of the Image." FAC ¶ 156. That describes an effort to improve training, not to foster infringement. *See Kadrey v. Meta Platforms, Inc.*, 2025 WL 744032, at *1 (N.D. Cal. Mar.

[5] For example, seeing "©EVOX IMAGES" in the output would at most communicate that EVOX might claim a copyright in the image; it would not tell the user that Google had no license or other authorization to generate the image and permit its further use. Indeed, Google had just such a license from EVOX for a number of years. It is little surprise that EVOX alleges no facts showing that customers are more likely to engage in infringement when CMI is absent, or that the presence of CMI would deter them from doing so.

7, 2025) (“*Kadrey II*”) (“[T]hat removing CMI might make the plaintiffs’ books work better as training data does not mean that removing CMI made it easier for Meta to commit copyright infringement.”); *McGucken v. Shutterstock, Inc.*, 166 F.4th 361, 370 (2d Cir. 2026) (affirming summary judgment on § 1202 claim where defendant removed CMI to avoid “viruses” and “dissemination of personally identifiable information,” “not for any reasons related to infringement”).

Count Five asks the Court to infer that Google intentionally removed CMI from unlicensed images during training—without any facts about how that occurred—because EVOX was able to generate a few outputs that show the same kinds of cars as EVOX’s licensed images and those newly generated outputs lack CMI. It then asks the Court to infer that Google knew the removal would hide a training use Google had publicly disclosed, or would lead users to infringe in ways no user is alleged to have done. *Twombly*, *Iqbal*, and *Hikma* do not permit that chain of inferences. Count Five should be dismissed.

## CONCLUSION

For these reasons, Google respectfully requests that the Court dismiss Counts Three, Four, and Five.

Respectfully submitted,

Dated: November 25, 2026

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

By: */s/ Eric P. Tuttle*
Eric P. Tuttle
Email: eric.tuttle@wsgr.com

*Counsel for Defendant*
GOOGLE LLC